Filed 2/11/26  P. v. Malan CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085125 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD299097) |
| MATTHEW BENAIAH MALAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Paula S. Rosenstein, Judge.  Affirmed.

Jo Pastore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Christopher P. Beesley, Supervising Deputy Attorney General and Kristen Kinnaird Chenelia, Deputy Attorney General, for Plaintiff and Respondent.

After Matthew Benaiah Malan was charged with eight felony counts stemming from a series of armed robberies,[1] he unsuccessfully moved for pretrial mental health diversion under section 1001.36. In denying the motion, the court reasoned that despite having a qualifying diagnosis, Malan posed an unreasonable risk to the public as well as a risk he would commit a "super strike." Malan contends the court's ruling lacks substantial evidence in the record, and thus was an abuse of discretion. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

We state the underlying facts from Malan's October 2023 preliminary hearing.

*Robbery of Q.D. and Family, Counts 1 and 2*

On May 3, 2023, Q.D. drove with his wife and son to a bank where his wife withdrew money, putting it in an envelope in her purse. Afterwards Q.D. drove to his wife's sister's house, where he parked and he and his son waited while his wife briefly visited. As they waited in the car, a light colored BMW SUV pulled up from behind and an individual approached, stuck his head inside the passenger window of Q.D.'s car and demanded money. Q.D. threw his wife's purse in the back seat toward his son, who told his father the man had a gun. Q.D. began giving the man his phone and credit cards, but his son threw the purse to the front of the car, telling the individual the

---

[1] The charges were robbery (Pen. Code, § 211; counts 1, 2, 7) (undesignated statutory references are to the Penal Code), first degree robbery (§§ 211, 212.5, subd. (a); count 3), first degree burglary (§§ 459, 460, subd. (a), 667.5, subd. (c)(21); count 4), attempted robbery (§§ 211, 664; counts 5, 6), and carrying a loaded firearm registered to another (§ 25850, subds. (a), (c)(6); count 8). The People further alleged as to the robberies and attempted robberies (counts 1, 2, 5, 6, 7) that Malan personally and intentionally used a firearm (§ 12022.53, subd. (b)).

money was in it. Q.D. saw the barrel of the gun while the individual took the envelope from his wife's purse and returned to the SUV.

*Robbery of H.C., Counts 3 and 4*

On May 10, 2023, H.C. drove home after going to a bank and parked his car in the garage. As soon as he exited his car, a masked man standing at the rear of his car demanded money. H.C. first told him he had no money, but then when the man said he knew he had some, H.C. showed him he had only $12 in one pocket and $60 in the other. H.C. saw that the man had his left hand in his pocket, so H.C. gave him the money because he thought there might be something in his hand, and something bad might happen to him. The man took the $60, then opened the door of H.C.'s car, checked a briefcase there to find nothing, and left. He crossed the street and entered the passenger side of a grey BMW SUV, which drove away.

*Attempted Robbery of L.F., Count 5*

On May 17, 2023, L.F. withdrew $20,000 from his bank and drove to another ATM to withdraw additional funds. As soon as he exited his car, a white vehicle approached and an occupant pointed a black handgun at him, saying, "Give me all your money." L.F. decided to run, so he sprinted toward a mall. He heard a voice behind him say, "I'm going to shoot you. One, two, three," but L.F. made it to the door of an establishment and entered. L.F. saw the vehicle drive back to his car where he had left his money, so he began to walk back to it to take a picture and called police. The white vehicle parked behind L.F.'s car for a brief period but then drove away.

*Attempted Robbery of R.N., Count 6*

On May 19, 2023, R.N. withdrew $10,000 from his bank then drove to a friend's apartment in La Mesa. R.N. did not park because he noticed a BMW SUV behind him, so he drove around the block and chose another spot. R.N.

parked because he did not see the BMW, but suddenly it appeared in front of him in the middle of the street, blocking him. A man wearing a hoodie and mask exited the passenger side with a metal bar in one hand and a black handgun in the other and started hitting R.N.'s car window with the bar. The man demanded R.N. open his door, but R.N. refused. R.N. recalled that the man said that if R.N. kept moving, he was going to shoot him. He started his car, put it in reverse to make space and drove away, but the BMW followed him to a warehouse store, where he asked workers for help.

*Robbery of T.Y., Count 7*

On May 22, 2023, T.Y. withdrew $5,000 from a bank then went with his wife to a coffee shop. As soon as they parked, a silver BMW pulled in behind them, blocking them in. A masked man exited from the BMW, approached T.Y. with a Glock-style firearm and demanded his money. After T.Y. denied having money, he and the man struggled through the driver's side window, with T.Y. trying to push the man away. T.Y.'s wife ran away, but returned while the man leaned inside T.Y.'s car and continued to demand money. The man threated to kill T.Y.'s wife if somebody called police. After the man produced a knife, T.Y. gave him about $2,300.

*Carrying a Loaded Firearm, Count 8*

A detective investigating the robbery and attempted robbery incidents involving a silver BMW SUV was able to tie that vehicle to Malan's codefendant, Marcus McLaughlin. Data from McLaughlin's phone put it at the locations of each bank or robbery. Officers eventually arrested McLaughlin and Malen in the BMW while it was parked in a Chase Bank parking lot. They found a loaded gun hidden behind a steering wheel panel.

4

*Section 1001.36 Motion*

After Malan was charged, he moved for pretrial mental health diversion under section 1001.36. He argued he was eligible for such diversion because within the last five years he had been diagnosed with qualifying mental disorders: severe opioid use disorder, posttraumatic stress disorder, alcohol use disorder, and attention deficit/hyperactivity disorder. Malan pointed out he was entitled to a presumption that these disorders played a significant role in the charged offenses. He argued he was suitable for diversion, pointing to a psychological evaluation by Dr. Robert Kelin stating he was motivated to be successful in intensive drug treatment, would respond well to it, and was eager to maintain his sobriety.[2] Malan argued there was insufficient evidence for the court to find he posed an unreasonable risk of danger to public safety, that is, that he would commit one of the limited subset of violent felonies enumerated in the statute (otherwise referred to as "super strikes") such as sexually violent offenses, lewd acts on children under 14, homicide, assault with a machine gun on an officer, possession of a weapon of mass destruction, and offenses punishable by life in prison. He pointed out his current offenses were not super strikes and argued there was no evidence to suggest he was at risk of committing such an offense in the future. He stated that Dr. Kelin concluded that so long as he maintained his sobriety and participated in an "intensive and structured treatment program

---

[2]    Though Dr. Kelin stated his report was confidential, the public defender attached it to Malan's statement in mitigation filed in advance of his sentencing.

and prosocial activities, such as employment," he would not pose a danger to the community, but would be a productive member of society.[3]

The People opposed the motion, arguing Malan was not suitable for diversion. They conceded Malan had a qualifying mental disorder, and the court could find it was a significant factor in the offenses' commission (that is, there was an absence of clear and convincing evidence the disorder was not a motivating, causal, or contributing factor in the offenses' commission). The People argued Malan was nevertheless not suitable for diversion because he posed an unreasonable risk of danger to public safety. They argued based on his personal role in the numerous armed robberies and attempted robberies—concealing his face, using a gun, and at times threatening the victim's lives—he was likely to commit murder, attempted murder, or kidnapping for robbery. They pointed out the crimes involved substantial sophistication and planning. The People argued that as in other cases (*People v. Graham* (2024) 102 Cal.App.5th 787 (*Graham*), for example), Malan's violent crimes, standing alone, were enough to deem him an unreasonable threat to public safety. They pointed out that Dr. Kelin acknowledged Malan had problems with anger and while in jail he was found with a shank, showing his continued willingness to resort to violence. They also pointed to Dr. Kelin's report indicating that given his long history of drug use, including fentanyl,

---

[3] Dr. Kelin's report on this point states: "If Mr. Malin is drug free and working, the evaluator does not believe that he poses a risk to the community. However, if he relapses to drug use, the evaluator expects that he would pose a risk to the community. Therefore, he needs an intensive treatment program with ongoing drug testing and supervision. Fentanyl is a very powerful drug and it is very easy to relapse. Mr. Malan has a long history of drug use and poor judgment. Therefore, Mr. Malan needs a lot of supervision and ongoing drug treatment and drug testing if he is not to be a danger to the community."

Malan needed to work hard to maintain good behavior and needed strict supervision, ongoing treatment and drug testing; if Malan relapsed, Dr. Kelin expected he would pose a risk to the community.

At the hearing on the motion, Malan's counsel acknowledged that while Malan's conduct was concerning, he was only 21 years old (and younger at the time he committed the offenses), and influenced by an older codefendant. He asserted Malan had no criminal history or history of violence. Counsel stated that Malan had a history of drug addiction stemming from childhood trauma, and that the Legislature intended the diversion law to apply to individuals like him. He pointed out Malan had a supportive father and family members, which would reduce the risk that he would commit a super strike. Counsel argued Malan's crimes, which did not rise to the level of any super strike, were "purely a product of his drug addiction, not because he's a violent person, not because he has a history of being violent, but simply because he is an addict."

The prosecutor began by questioning whether the Legislature intended the diversion law to apply to someone like Malan who had multiple chances at treatment but committed the robberies anyway in a calculated and "extremely terrifying" manner. She complained that Dr. Kelin in a conclusory fashion and without detail blamed Malan's criminal conduct on his drug use. She highlighted *Graham*, *supra*, 102 Cal.App.5th 787, where the Court of Appeal upheld an order denying diversion based on the dangerousness of the underlying conduct, which involved a kidnapping for robbery. She pointed out the defendant in *Graham* was not the individual who held the weapon or the victim. The prosecutor argued that Malan's conduct, which showed a high level of planning and sophistication, was more severe as it involved him following victims from banks knowing they had

7

withdrawn substantial sums of money, repetitive criminal conduct, and violent instances of him putting guns in people's faces, fighting and struggling with them to get their cash. The prosecutor stated there was evidence Malan and his codefendant used the money not to buy drugs, but designer shoes and clothing, reflecting a motive unrelated to drugs. She argued that even in custody and sober, Malan was unable to remain law-abiding, and that he was not confronting his need for treatment. She emphasized Malan's use of a firearm: "One pull of that trigger, in frustration maybe, when a victim is not turning over what they're demanding, results in an attempted murder or murder. Asportation. One additional element to robbery results in kidnapping for robbery. [¶] Again, frustration, maybe, that somebody is not turning over what they're demanding. Transport that person someplace else, potential kidnap for robbery, which is a super strike."

The trial court declined to order pretrial diversion. It reasoned: "[Malan] has committed multiple crimes with firearms, threatening people. The fact that he didn't actually pull the trigger is of little persuasion. Going to the bank, following a person out of the bank, confronting them with a gun, whether he held it or somebody else held it, I don't know. That's not what this court is here to determine. But this is highly dangerous conduct. There is, in this court's view, a risk of a super strike. And there was in each of these instances." The court found based on *Graham, supra,* 102 Cal.App.5th 787 that Malan's case did not qualify for mental health diversion.

*Guilty Plea and Judgment*

Malan ultimately pleaded guilty to all of the charged counts and admitted the enhancement allegations. He admitted aggravating factors under California Rules of Court, rule 4.421, subds. (a)(1), (a)(2), (a)(8) and (b)(1): "the alleged offenses involved great violence, great threat of bodily

8

harm, or other acts disclosing a high degree of cruelty, viciousness or callousness"; "the offenses were carried out with planning and sophistication"; he "engaged in violent conduct which indicates a serious danger to society"; and he "was armed with a firearm . . . ." The trial court sentenced him to 15 years in prison.

Malan filed this appeal.

## DISCUSSION

### I. *The Law*

Sections 1001.35 and 1001.36 give trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (See *People v. Frahs* (2020) 9 Cal.5th 618, 626; *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 677-678.) Such "[d]iversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*); *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133; see also *Frahs*, at p. 624.) "The express purpose of this legislation was to '[i]ncrease[ ] diversion of [such] individuals' [citation] based on concerns that 'incarceration only serves to aggravate [their] preexisting conditions and does little to deter future lawlessness.' " (*Sarmiento*, at p. 890.) Thus, the Legislature intended the mental health diversion program to apply broadly. (See *Sarmiento*, at p. 891; *Gomez*, at p. 678; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*).)

To qualify for mental health diversion, a trial court must find a defendant is both eligible and suitable. (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.) A defendant is eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged. (*Ibid.*; see also *Vaughn v.*

9

*Superior Court, supra*, 105 Cal.App.5th at p. 133.)  A defendant is suitable if "(1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv)."  (*Sarmiento,* at p. 891.)

"An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means 'an unreasonable risk that the [defendant] will commit a new violent felony' within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are 'colloquially referred to as "super strikes." ' [Citation.] 'Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.' [Citation.] In making the unreasonable risk of danger to public safety determination, the court 'may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate.' " (*Gomez v. Superior Court, supra*, 113 Cal.App.5th at p. 679, quoting 1001.36, subd. (c)(4); accord, *Whitmill, supra*, 86 Cal.App.5th at p. 1149; *People v. Moine* (2021) 62 Cal.App.5th 440, 449-450 (*Moine*).)

It is the defendant's burden "to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for

diversion and that the defendant and the offense are suitable for diversion."
(§ 1001.36, subd. (e); see *Vaughn v. Superior Court, supra*, 105 Cal.App.5th at
p. 134.) Even if the defendant makes that showing, the court still has
discretion to deny diversion. (*Sarmiento, supra*, 98 Cal.App.5th at p. 892.)
However, "this 'residual' discretion must be exercised ' "consistent with the
principles and purpose of the governing law." ' [Citations.] That purpose
includes a strong legislative preference for treatment of mental health
disorders because of the benefits of such treatment to both the offending
individual and the community. Where the court chooses to exercise this
residual discretion to deny diversion, its statement of reasons should reflect
consideration of the underlying purposes of the statute and explain why
diversion would not meet those goals." (*Id*. at pp. 892-893; accord, *Vaughn*, at
p. 135.)

We review the court's decision to deny a motion for mental health
diversion for abuse of discretion. (*Vaughn v. Superior Court, supra*, 105
Cal.App.5th at p. 135; *Whitmill, supra*, 86 Cal.App.5th at p. 1147.) " ' "A
court abuses its discretion when it makes an arbitrary or capricious decision
by applying the wrong legal standard [citations], or bases its decision on . . .
factual findings that are not supported by substantial evidence." ' " (*Vaughn*,
at p. 135, quoting *Graham, supra*, 102 Cal.App.5th at p. 795; *Whitmill*, at p.
1147.)

II. *Substantial Evidence Supports the Order Denying Diversion*

The sole question in this appeal is whether substantial evidence
supports the trial court's finding that Malan is unsuitable for mental health
diversion because he poses an unreasonable risk of danger to public safety if
treated in the community. (§ 1001.36, subd. (c)(4).) "[A] defendant is not
suitable for diversion if the defendant is 'too dangerous to be treated in the

11

community because he [or she] would commit a new violent super strike.' " (*Graham*, *supra*, 102 Cal.App.5th at p. 799.)

According to Malan, the evidence does not support a conclusion that he presents a risk of committing a super strike offense. He distinguishes *Graham*, *supra*, 102 Cal.App.5th 787 on which the People and trial court relied, and compares his circumstances to those in *Sarmiento*, *supra*, 98 Cal.App.5th 882, as well as *Whitmill*, *supra*, 86 Cal.App.5th 1138, *Moine*, *supra*, 62 Cal.App.5th 440 and *People v. Williams* (2021) 63 Cal.App.5th 990, in which the appellate courts reversed orders denying mental health diversion. Pointing to these cases, Malan argues the court abused its discretion because his current offenses are not super strikes, one of his victims did not see a gun and there was no overt threat of violence, and the fact his crimes could have escalated into super strikes is not dispositive where they did not escalate in that respect. He points out that Dr. Kelin stated he was amenable to treatment, and if he was treated, he would not pose a risk to public safety. He argues that as in *Sarmiento*, there is "insufficient evidence to show that an intensive treatment program as recommended by Dr. Kelin would not be successful such that the aims of the mental health diversion statute would not be met."

We begin by discussing whether we are persuaded that *Sarmiento*, a case from this court, compels reversal. In our analysis, we emphasize that our review is deferential, and an abuse of discretion is not shown where reasonable minds might disagree on whether Malan is likely to commit a super strike or the evidence could support a different conclusion. (See *People v. Brown* (2024) 101 Cal.App.5th 113, 124 ["the existence of some evidence in support of [a finding that the defendant would not pose a significant risk so long as he stayed compliant with his medication] is not a sufficient basis for

12

this court to supplant the findings of the trial court"].)  In *Sarmiento*, the defendant walked into a liquor store and handed the clerk a napkin reading, " 'Let me get the money.' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 886.) After being charged with attempted robbery, she petitioned for mental health diversion based on diagnoses of posttraumatic stress disorder, major depressive disorder, and stimulant use disorder specific to methamphetamine.  (*Id.* at p. 887.)  The trial court denied diversion.  Even though the defendant had met the eligibility standards, the court found her inability to remain drug-free after prior substance abuse treatment indicated she would not respond well to mental health treatment.  (*Ibid.*)  It also found that while she was unlikely to commit a super strike offense, the defendant nonetheless " 'pose[d] an unreasonable risk of danger to the public.' " (*Ibid.*) A majority of this court found neither finding was a proper basis to deny diversion.  (*Id.* at pp. 887, 894-895.)[4]

With respect to the trial court's dangerousness finding, the majority observed that the court did not make a finding that the defendant was likely to commit a super strike violent felony, and thus "implicitly acknowledg[ed]" there was no such likelihood.  (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 895.) The majority held the court misapplied the statutory criteria, explaining that

---

[4]    Observing the defendant had never received treatment for her mental health disorders, the majority first held the "the trial court failed to appreciate the distinction between different types of treatment, conflating substance abuse recovery with therapy and medication directed at PTSD and depression."  (*Sarmiento, supra,* 98 Cal.App.5th at pp. 893-894.)  Though the defendant's prior attempts at drug treatment were arguably "unsuccessful," she had never received treatment for her mental health conditions, which drove her to substance abuse as a form of self-medication.  (*Id.* at p. 894.)  In short, the majority saw no substantial evidence to support the court's conclusion that the recommended treatment program would not meet the defendant's specialized mental health treatment needs.  (*Id.* at p. 895.)

13

while the trial court retains residual discretion to deny diversion where threshold eligibility and suitability requirements have been met, the court could not "reject a request for diversion based on an alternative meaning of 'public safety' inconsistent with the specific statutory definition in section 1001.36, subdivision (c)(4)." (*Id.* at p. 896.)

Ultimately, the majority in *Sarmiento* found no substantial evidence to support a conclusion that the defendant was likely to commit a super strike offense, noting "the charged offense in this case involved no evidence of a weapon or threat of violence." (*Sarmiento, supra,* 98 Cal.App.5th at p. 897.) The majority observed a trial court had committed a similar error in *Whitmill, supra*, 86 Cal.App.5th 1138, in which the defendant, a veteran with sexual trauma and PTSD complicated by substance abuse, had threatened to kill his girlfriend after firing a gun in the air. (*Sarmiento*, at p. 896, citing *Whitmill*, at pp. 1144-1146.) The Court of Appeal in *Whitmill* reversed the trial court's order denying diversion, which had applied an incorrect standard. (*Sarmiento*, at p. 897; *Whitmill*, at p. 1156.)[5] The *Sarmiento* majority summarized *Whitmill*'s holding: "Considering the defendant's lack of a prior record of violence and the totality of circumstances in the case, the [*Whitmill*] court concluded there was 'no substantial evidence to support the trial court's finding that appellant posed an unreasonable risk of committing a super strike if treated in the community.' " (*Sarmiento*, at p. 897, citing *Whitmill*, at p. 1156.)

---

[5] In *Whitmill*, the court found "the trial court's discussion of objectives to deter defendant from committing future offenses demonstrates it relied on general sentencing objectives set forth in rule 4.410 of the California Rules of Court," instead of "the primary purposes of the mental health diversion statute as set forth in section 1001.35." (*Whitmill, supra*, 86 Cal.App.5th at p. 1156.)

14

The circumstances here are very different from those in *Sarmiento*, in which we specifically observed the charged offense involved no evidence of a weapon or threat of violence. Additionally, *Sarmiento* involved a single incident, as did *Whitmill*. (*Sarmiento, supra,* 98 Cal.App.5th at p. 886; *Whitmill, supra*, 86 Cal.App.5th at pp. 1142-1143.) Here, Malan committed a series of robberies in which he mostly used a gun, later found loaded in his codefendant's car, and threatened the victims, at times telling them he would shoot them. The robberies escalated in severity to the point that Malan struggled with one of the victims. Another involved Malan and his codefendant following one of the victims as he fled to a place of safety. Unlike the crime in *Sarmiento*, Malan's offenses reflected a calculated pattern of violent robberies, repeated use of weapons, and escalating seriousness evidenced by the physical struggling or pursuing victims. And even in jail Malan was found in possession of a weapon. Thus, *Sarmiento* does not assist Malan. It was not unreasonable for the trial court—which made a specific finding about Malan's risk of committing a super strike—to consider how Malan's robbery incidents might have unfolded had the victims caused him to become frustrated or defensive. The absence of a previous or current super strike is not dispositive. (See, e.g., *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [involving a dangerousness finding under Proposition 47].) We hold notwithstanding Malan's lack of a prior criminal record or mental health treatment, the circumstances of his offenses in and of themselves support the trial court's specific finding that treating Malan in the community would pose an unreasonable risk of a super strike such as murder, attempted murder, or kidnapping for robbery. (Accord, *People v. Bunas* (2022) 79 Cal.App.5th 840, 862 ["[T]here is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court from relying primarily, or even entirely, on the

circumstances of the charged offense or offenses in denying a motion for diversion"]; *Graham*, *supra*, 102 Cal.App.5th at p. 799 [same].) We hold the court's ruling did not exceed the bounds of reason.

We are not persuaded by Malan's attempt to distinguish *Graham*. He points out the defendant in *Graham* had been convicted of two super strikes, had a long history of not responding well to treatment, and her disorder did not have a connection to her crimes. In *Graham*, the defendant lured the victim to a motel room where her codefendant grabbed him, pushed him down on a bed, then demanded his PIN while pressing a box cutter with an exposed blade on his neck. (*Graham, supra*, 102 Cal.App.5th at p. 800.) They later drove the victim around, with the defendant saying they would take him " ' "to the woods." ' " (*Ibid.*) The Court of Appeal observed that the "defendant took numerous intentional and calculated steps over a substantial period of time to kidnap and rob the victim with [her codefendant]." (*Ibid.*) It pointed out the evidence showed she had numerous opportunities to abandon her codefendant and scheme but did not do so. (*Ibid.*) Thus, "[i]t was reasonable for the trial court to infer from [the facts of the offenses] that, because defendant was recently capable of engaging in such violent, calculated criminal behavior, she posed a risk of doing so again." (*Id.* at p. 801.) While given the procedural posture of the case, the trial court could find the defendant in *Graham* committed super strikes (*id.* at pp. 793-794) here, like in *Graham*, Malan's participation in the robberies was calculated and escalating; he could have abandoned the crimes, which occurred over the course of several days; and his conduct was even more dangerous given his personal use of a gun.

Malan's other cited cases do not compel a different result. In *People v. Williams*, *supra*, 63 Cal.App.5th 990, a felony stalking case, the Court of

16

Appeal held it was an abuse of discretion to find the defendant posed an unreasonable risk of danger in part because despite his "violent, hateful and specific" threats, there was no evidence he owned, possessed or had access to any weapons, and the trial court had previously released him on bond without incident. (*Id*. at pp. 993-994, 1003-1004.) The defendant in *Williams* had no prior criminal record, faced no other pending charges in unrelated cases and, while his threats were "horrific . . . , he never actually assaulted anyone or engaged in any violence." (*Id*. at p. 1003.) In *Moine*, none of the defendant's offenses involved a violent felony, and the People did not present evidence he was likely to commit a super-strike offense in the future. (*Moine*, *supra*, 62 Cal.App.5th at pp. 450-451.) Further, two psychiatrists had determined the defendant posed a low risk for future assault. (*Id*. at p. 451.) Here, Dr. Kelin's conclusion about Malan's risk of danger was not that it was low, but conditioned on him being "drug free and working," as well as successful drug treatment. He expressed concern about Malan's risk of relapsing, and explained he needed to "work hard to overcome his background." Dr. Kelin found Malan would pose a risk to the community if he returned to drug use, something Malan had done since age 12.

We reiterate that while reasonable people may disagree about Malan's potential risk, we are not to substitute our judgment for those of the trial court that are supported by substantial evidence. (See *People v. Brown*, *supra*, 101 Cal.App.5th at p. 124.) As stated, we conclude such evidence supports the court's order denying pretrial mental health diversion, and hence it was not an abuse of discretion.

17

## DISPOSITION

The order is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:


KELETY, J.


RUBIN, J.